Good morning, Your Honors. I'd like to thank the panel. And before I begin, I need to say that I'm here, and this was a hard-fought case. I deeply respect Senior Judge Brack and Marissa Ong. But I believe that this trial showed that Mr. Dalton's right to present a defense was violated. And how do you know that? I think you know that by looking at the record and the way that it played out. The government, since you, like all criminal cases— Which is the strongest of your arguments? Which would you concentrate for us? And I'm going to concentrate specifically on the argument of excluding Maria Nevarez and then the denial of the ability to use the recorded audio of Agent Brackeen's interview. And I think that the government, when it brought this case— The Court really didn't exclude her testimony. That was her choice, right? I don't believe that was her choice, Your Honor. Was there an order, you may not testify? No, there was not. So the Court didn't exclude her. I think that when you look at what happened, the government is the only party to the case that can provide immunity to somebody. The Third Circuit was the only circuit that actually has ever allowed for judicial immunity, and they backed off of that stance. But the combination of excluding Maria Nevarez and the recorded statement prevented Michael Dalton from admitting evidence that was material to his defense. I asked, and Judge Brack asked me, if Maria Nevarez not testifying and then me being allowed to circumvent cross-examination and those kind of things would be like me allowing me to have my cake and eat it too. And I responded, I cannot offer Maria Nevarez immunity. And then I said, I asked the government, Ms. Hong, for immunity, and that was denied. At that point in time, we looked to essentially whether or not, under United States v. Orozco, the witness was excluded, and that exclusion violates the Sixth Amendment. I think that here it does. Judge, you're right. What were the facts of that case? Was the witness actually excluded in that case? The witness was essentially, for lack of a better term, threatened by the United States Attorney, and that didn't happen in this case. Right. I think that the factors, though, are important, because the first one was whether or not the witness consulted with a lawyer and whether that was meaningful. I don't think that you can say, I appoint you an attorney, he comes in, he says, what's happened? They're threatening to prosecute me if I testify and I take the stand. That that can ever be a meaningful consultation that is done usually in the anteroom to the court, where somebody says, well, I'm telling you right now, don't testify. We saw that play out many times recently in the De Leon matter in the District of New Mexico. And so there is an attorney who is called and a public defender, a CJA attorney, or anybody who is brought in to say, talk to this person, find out if she wants to testify. That can't be, I would submit, any meaningful interpretation. The degrees of warning that were provided. United States v. Juan talks about other parties to the case that can provide the warning, the court in Webb or other things. Here, I think Maria Nevarez's mind has to be focused on all the threats that happened when she interviewed with Agent Burkine. The threats of the DNA testing that the government knew had borne out as not correct. Why is the United States v. Serrano, our case 2005, not at on point with the son who is in the same situation? I think that the issue in that case where the son was prevented, excuse me, I believe that that's not on point. Because I think that the exclusion here and the defense here was much more material focused solely on the facts that Maria Nevarez could have provided by way of the exculpatory evidence that would have contradicted the government's main evidence. And I think that that is because here, Maria Nevarez was the only person who could have provided testimony that Michael Dalton did not know about the weapons. The weapons that were located in the dresser drawers, and she testified behind a curtain. They were located, that was where the photos showed that they were located. The testimony at trial confirmed that the firearms and ammunition were located there. Maria Nevarez had told Agent Burkine on July, excuse me, June of 2016 that that's where everything would be located and everything was located. And that the absence of any scientific evidence did that. And I think that that's what made Maria Nevarez's, and distinguished this case, and made Maria Nevarez's testimony that much more important in this scenario. Of course, she gave several inconsistent stories about the weapons too. One time she said there were no weapons. One time she said there were. One time she said it belonged to someone else. So she's, I mean, don't you think that has to play into the calculus of whether she, how important a witness she is? Respectfully, Your Honor, I disagree. I think there's only two versions. She said that there were no weapons in the house on August 28th. And then in her interview with Agent Burkine, she said there were weapons in the house that belonged to somebody else. She did not deny that those were weapons that were in the house. She simply said that those were weapons that belonged to somebody else and that Michael Dalton did not know about those weapons. And I think that that's. I guess the point is still the same, though, isn't it? I mean, aren't those inconsistent stories something to be considered about how important a witness she would be? Yes, Your Honor. I would submit that those are importancies that need to be submitted to the jury as the finer of fact. And I don't think that those were issues that dealt with the trustworthiness of that statement. I think that's a credibility determination that the jury should have been allowed to make upon viewing her testimony, testify, and subject to cross-examination. And so here, the testimony of Ms. Nevarez was not the problem. It was her actions that were going to involve her being charged. She had had the weapons, and the government alleged and I think could have proved that she was a drug user. And so it wasn't she was going to get on the stand and say something that may or may not have provided criminal liability. She was going to, if she came forward, she would simply by being, actually without even coming forward, she could have been charged. And so. Was there, I think you've already said, that a formal request was not made? Your Honor, on page 52, I had a discussion with the court. And I said, yes, I had asked Ms. Ong for immunity. And the government on page 53 says that, or the court says, Ms. Ong, is that correct, that you're not going to offer immunity? And Ms. Ong says that's correct. And so I would submit that a formal request was made for me. Your Honor, you could start. Did you make a proffer of proof of exactly what she would testify to if she were allowed to? Yes, Your Honor. I believe at three different times I submitted. One, the first on the pretrial hearing, I simply made a proffer in the truest form of the version. This is what we'd testify if she would do. On a directed verdict and a motion for a new trial, I actually submitted a transcript and the audio. And our review is for? I believe this is a de novo review because it's a constitutional interference in Mr. Dalton's due process right to a fair trial. Well, the prosecution's decision could be based, is based, is reviewed, excuse me, on abuse of discretion, right? I disagree, Your Honor. I think that this is a constitutional issue, and I think that in looking at this, this. Well, you don't argue that the prosecution had discretion to make that judgment call. I don't argue that they had the discretion. You're just saying that the discretion was abused because it denied him an effective defense constitutionally? Yes and no, Your Honor. I am saying that they are the sole individual who could decide to do that. I understand that. I'm toying with their abusing discretion. I'm just looking for the constitutional violation. Yes, Your Honor. I think that that is the constitutional violation. I think that their decision not to grant immunity to somebody who, a year and a half earlier, hadn't provided a statement that would have inculcated them and then still, to this day, has not been charged, I think shows that what they were doing is they were trying to put forth, and they had the keys to whether or not Mr. Dalton had a fair trial and was able to present a witness. But the constitutional violation is what, a deprivation of a fair trial? Yes, Your Honor. Essentially, a tactical exclusion of evidence. All right. Thank you. Are you going to address the search warrant issue? I was not. I would simply stand in my brief on that. I think I beat, respectfully, Your Honor, I think I beat that horse and lost that. But I do believe, adamantly, as I briefed that. And what about the video? Excuse me? And what about the video? The video? I think that that was, once again, another issue. I think my main focus, Your Honor, here is I believe that when I put forth and I had the ability to provide a witness who pursued the U.S. v. Alano, I sought immunity in the district court. The witness was available. The testimony was exculpatory for Michael Dalton. It was essential and testimony that was not against the government's interest, and there was no strong reason not to grant immunity. No, no, no. I meant the video. That's a separate argument. That's a separate argument, Your Honor. I would rest on my briefs with that respect. All right. Let me just chime in again as far as the search warrant. So the May 1, 2016 search warrant and the ammunition that's found, the .22 caliber ammunition, that is in the government's hand, you're walking away from that? No, Your Honor, I'm not walking away from that. I think that that search warrant was based upon false information that the government, excuse me, the Roswell Police Department knew. They did not have it. They had recovered the individual and they had recovered the vehicle and the weapons and Mr. Wheeler prior to entering the house. I think that that search warrant is invalid under the Fourth Amendment. So why isn't that your strongest argument, then? Respectfully, based on the amount of time, the amount I got beat up by Senior Judge Brack on that, Your Honor. And so I could not convince Judge Brack of the fact that when they had seized the . . . You mean that mild-mannered judge beats up defendants? I enjoy trying cases . . . As counsel, I should say. I enjoy trying cases in front of him, Your Honor. But the issue was, I think that, and this is a black and white opinion issue, but I think it is a violation of the Fourth Amendment. There was a vehicle that was seen with an individual that was recovered, and prior to the entry of the house they had recovered the weapon, they had recovered the vehicle, they had recovered the individual. There was no need to enter that house. Well, but the affidavit said that experience of the affiant, when you find weapons in the car, it makes it more likely there will be weapons in the house as well. He drew on his own experience for that, and that was explicitly accepted as an adequate statement by the affiant. I mean, how can we . . . There certainly is a factual basis for that. I think that that statement by the affiant was misleading, because the affiant did not inform the court, and the affiant had the ability to inform the court, or go back to the court and say, I arrested Mr. Wheeler in the backyard prior to entering the house. I am requesting to go in there. They entered essentially the way that it played out under quote, unquote . . . But that hadn't happened by the time the warrant, the affidavit was prepared and submitted to the court. By the time it was prepared and submitted, no, but before it was executed, Your Honor, yes, it had happened. Well, are you proposing that officers . . . Gee whiz. By the time you execute the warrant, you're in the middle of the soup. And are you proposing a rule that in the middle of executing the warrant, you discover something? You've got to say, ho, ho, right there in your flight, while I run back and amend the affidavit and get a new search warrant of some kind? Your Honor, I would disagree with the way the court phrased in the middle of execution of search warrant. I believe they had everything, the scene under control, and they had no reason to go into the house. And I believe that whether the search warrant was entered at that time or two or three days later, they should have gone back and corrected. I believe it was a misrepresentation. Was the affidavit and the warrant built on the notion that Mr. Dalton had been the driver of the automobile that had the firearm left in it? Yes, Your Honor.  Well, you say false. You say misleading. You say franks. But at the time they thought that, at the time that they got the warrant, so it's not bad faith or something where they're putting erroneous information. It's just that facts developed. And by the time that they had the warrant, they had information it was not Mr. Dalton driving. It was Mr. Wheeler. So I tried to show that the officer had it. There was a difference of opinion to that, Your Honor. And I believe that that was a difference of opinion. I believe the officers knew it was Mr. Wheeler in the car when they asked for the warrant. Well, but more seriously, the affidavit doesn't even say who is the driver. The affidavit says, if I had had prior knowledge that this vehicle belonged to Michael Dalton, who has an outstanding warrant, there's nothing in there about the driver. So there's no falsehood. And so he was saying, what he was telling the judge is, this vehicle belonged to the defendant. We found guns. We think there's guns in there. We want to search it. And that's a credible reason to want to search a car. There was nothing in there about the driver. Respectfully, Your Honor, I think that they materially omitted Wheeler. I believe they knew that Wheeler was there, and they just left that out because it was Mr. Dalton. But there was, I mean, you sometimes need to make an additional statement to correct something that was false when made, but there is no statement of any kind in here about who the driver was. And I believe that was omitted intentionally. Okay. May it please the Court. My name is Marissa Ong, and I'm an assistant United States attorney in the District of New Mexico. I would like to begin with where co-counsel began with the immunity issue in this case, and I think Serrano, the case out of the Tenth Circuit, clearly puts to rest any of the arguments that he raised in his brief. First, there was no improper government coercion. The judge in this case appointed an attorney to represent Ms. Nevarez, and after independent consultation with that attorney, she elected to raise her Fifth Amendment privilege not to testify in the case. And Judge Brack even noted in the order that he issued with regard to whether or not her statements could come in under Rule 807  because even if she stated that she had at some point possessed those firearms or someone else owned those firearms, that did not go to whether or not Dalton had actually possessed the firearms at any point in time. Additionally, it's within the sole discretion of the United States Attorney's Office to offer immunity. So now I'd like to move to the second issue that was up for discussion, and Judge Phillips, I know that you had some questions about that. With regard to the 404B evidence in this case, this court under Hill has stated that the exclusionary rule does apply to 404B evidence. That was brought to the court's attention, and the court went through the analysis of whether or not the evidence discovered on May 1, 2016, had been properly obtained. Now what happened was an officer, Wren, testified to this outside the presence of the jury prior to that information being given to the jury. He testified that on May 1, 2016, they saw the defendant Dalton's car being driven, that they tried to initiate a traffic stop, that the car took off and then was parked in front of Dalton's residence. They also, in the warrant, specifically stated that they asked a neighbor if they could see what happened to the driver. The neighbor said they saw the driver go into the backyard. Officer Wren testified that at that time, they did not know who the driver was. They did not know that it was Ferris Wheeler. The information in the warrant also stated that then they called out Dalton and Ms. Nevarez, who was his girlfriend. They came out of the residence, and Dalton denied being the driver in the vehicle. All of that information was in the warrant, and all of that information was relayed to the magistrate judge at the time that they applied for the warrant. Can you be more precise on the chronology? Because you just lumped a whole bunch of things together as though it happened simultaneously. And in fact, when you say they had seen this car being driven, that wasn't Officer Wren. He responded otherwise, correct? That's correct. That was Officer Crane, who was the affiant of the search warrant. And the car was parked in the alley, not in front of the house. It was parked in the alley next to the defendant's house. That's correct. And what the neighbor reported is, and this is from the affidavit, not Officer Wren testimony. Once the vehicle was released, or was cleared, affiant made contact with a neighbor who advised he observed the driver jump a fence into the backyard of the Kenlia address. And then where is Mr. Wheeler found, ultimately? In the backyard. And how many minutes elapsed before they find him, approximately? I believe it's longer than an hour, Your Honor. What Officer Wren testified to is that all of that information that was known to them at the time, Officer Crane then left to go get the search warrant. They start executing the warrant, and it's not until they begin executing the warrant that they find Wheeler in the backyard of the residence. Now, that's not my understanding. My understanding is that Crane goes off to get the warrant. They have not found Wheeler. Sometime 20 minutes afterward, approximately, they find Wheeler. Back comes Crane with the warrant, and Dalton and his girlfriend come out. But they know about Wheeler before they go into the home to execute the warrant. What Officer Wren testified to is they knew that Wheeler was wanted for murder, but he never testified that they knew that Wheeler was in the backyard when Officer Crane left to go get the warrant. I agree with that, but that's not what I said. They knew when Officer Crane came back with the warrant about Wheeler. They found him in the backyard before they ever executed the warrant. And, Your Honor, that is correct. I apologize. I believe I misspoke there. And it's important because what they find is stray ammunition in a bedroom in plain view, which how can Dalton say, I didn't know about the ammunition, where he could say that with the August search because it was all hidden. And so wouldn't that have had an awfully big impact on the jury in trying to determine whether in August he knew about the guns and the ammunition? Well, Your Honor, the information that Dalton gave to the officers on May 1st was that he had gotten home approximately an hour ago, that no one had come in or out of the residence during that time, and that's the information that was relayed to the jury. And during Dalton's case in chief, he actually recalled an officer who was present for the May 1st incident and asked him specifically about Wheeler, about Wheeler being found in the backyard, and it also came out during Dalton's case in chief that Ferris Wheeler had access to the Kinley residence. So that information was before the jury. Well, let me ask it to you this way and then I'll get off of it. And that is, had the warrant gone to the, and I realize they didn't know that Wheeler was in the backyard, but hypothetically say that they had known that, the affidavit had gone to the magistrate saying this car belonging to Dalton sped away from us, we lost it for 15 seconds, we found it in the alley, a neighbor said someone jumped over the fence, and we found ultimately Wheeler in the backyard. We'd like to go in and search the house. Do you think you'd have probable cause to do that? Well, Your Honor, I think that that would be a closer call at that point. I believe that if they could communicate, if those were the simple facts that Wheeler was found in the backyard, then I don't know that the officers would have had probable cause. However, those are not the facts that were present here. They're the facts before they executed the warrant, though. Did probable cause dissipate is the question. The probable cause, well, Your Honor, there's nothing in this court's jurisprudence which would require the officer at that point to then re-notify the magistrate. They already had the search warrant to go into the house to search for the ammunition. And at that point, I would argue that they were acting under good faith. So I would raise a good faith argument in that circumstance. Well, there was one other fact, wasn't there, that was important. The officer said, quite apart from where Dalton was, the officer said, there's guns in the car. And in my experience, and the car was owned by the defendant. And in my experience, when a person has guns in his car, he's likely to have them in his house as well. That's unrelated to whether they found Dalton or whether they knew it. And why wouldn't that, regardless of whether they found Dalton or knew who the driver was or not, why wouldn't that have been sufficient to support the warrant? That fact didn't change. And you're correct, Judge Ebel, that fact wouldn't have changed. And that's why I would say that regardless of the changed circumstance, the officers executing the warrant at that point, they're acting on good faith that that warrant is valid. If there's no other questions. Well, I have one question, and that is with respect to the video. Yes, Your Honor. It ran for a full hour? No, Your Honor. The video in its entirety is an hour. Approximately 20 minutes of it were shown to the jury. And what portion of it was shown? The portions of the video that were shown to the jury show law enforcement on a megaphone calling Dalton out of the residence. There was a portion shown to the jury where the SWAT team arrives and they're discussing whether or not they're going to enter the residence. And then the remaining portion of the video shows the defendant coming out of the residence and stating that he was asleep. He didn't realize that law enforcement was outside. What was the purpose of showing 20 minutes of that video? Your Honor, the probative value of that video is it allowed the jury to assess for themselves Dalton's, A, the timing that it took to get Dalton out of the residence, which goes directly to his consciousness of guilt. It also allowed them to assess his statement that he was sleeping. There's a difference between an officer testifying, we were outside, we had a megaphone and we were calling him out, and allowing the jury to actually hear for themselves the amount of noise that was going on outside, the pervasiveness of them calling him out. And so his statement that he was sleeping also goes to his consciousness of guilt because it was our position that he was lying when he told the officers that. Well, why does that matter? Did the officer, is it the position of the government that he used that time to conceal the weapons? That was one of the arguments that was made. That argument was made to the jury? Yes, Your Honor. Thank you. Thank you, Counsel. The last argument that, unless there's any additional questions about the video, I'm happy to move to the last point that Dalton raised in his brief, which was that it was aired to admit the expert testimony in this case. The expert testimony, even though there was no evidence of fingerprint or DNA, the expert testimony was proffered to explain the absence of that in this case. We believe that it was properly admitted and there was no air. And unless there's any additional questions, I'm happy to return the rest of my time to the court. Thank you for doing so, Counsel. You have 20 seconds to go. Thank you, Your Honor. I'm aware of that. And the only thing I would respond is to the court's question regarding what portion of the video was shown. I think the video was extremely prejudicial and what was not mentioned was that there was, as I referred to, a tank or an armored personnel carrier that was shown in the video. And so I think the combination of excluding Ms. Nevarez, refusing to allow the recorded statement of Ms. Nevarez, and all the other evidence, as I briefed, was violating his right to a trial, Your Honor. Thank you. Thank you. And I compliment both of you on your presentation. Very well presented. Next case.